# ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

FILED-CLERK
U.S. DISTRICT COURT

2011 OCT 14  AM 9: 13

TEXAS-EASTERN

BY_____

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| **JAMES G. TEMME,** | : | |
| **STEWARDSHIP FUNDS, LP** | : | |
| Defendants, | : | |
| | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY

1.      The Commission brings this emergency action to ensure that Plano, Texas, resident James G. (Jay) Temme and entities he controls, including Stewardship Fund, LP ("Stewardship"), do not further harm existing or potential investors who have sought to fund the purchase and restructuring of non-performing residential mortgages.

2.      Over at least the past three years, Temme has raised at least $35 million from investors seeking to purchase distressed residential mortgage loans so that those loans can be restructured in order to become performing loans. To lure those investors, Temme developed relationships with, what potential investors understood to be, legitimate persons and entities that "vouched" for Temme, including an investment adviser representative with a major investment bank's private wealth management group (the "IAR") and a Texas-based public company that provides services related to efforts to restructure residential mortgages ("Texas Servicing Company").

3.      Temme has obtained funds from various investor groups, including one group that was advised by the IAR.  Typically, Temme sought groups or individuals to invest in limited partnerships in which a general partner would acquire at a discount "tapes" of distressed, foreclosed or nonperforming residential mortgages and work with the homeowner to turn the nonperforming mortgage into performing loans.  Investors were told that they would receive returns based on either payments from the homeowner or from the resale of the repackaged mortgages or underlying properties.

4.      In the course of his offerings, Temme and Stewardship have made multiple material misrepresentations and have misappropriated investor funds.  Their actions have resulted in a web of deceit.  For example, Temme and, through him, Stewardship, have: falsely represented that investor funds would be used to purchase certain mortgages or property when in fact the investor funds were used to pay off other investors; falsely claimed to own mortgages or other loans they did not; and falsely promised different investor groups that he had purchased the same loans on their behalf.

5.      It appears this situation has only been inflamed by efforts by several investor groups to hold Temme and Stewardship accountable through private litigation.  Rather than curbing Temme's fraud, this piecemeal litigation has only led Temme to fleece new investors.  On at least one occasion when he was sued by a concerned group of investors, Temme lured new investors to obtain money to resolve the litigation, despite the fact that a Texas state court had issued an order freezing accounts over which Temme had control or signatory authority.

6.      Through this conduct, Temme and Stewardship have violated, and, unless enjoined, will likely continue to violate, antifraud provisions of the federal securities laws, including Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7.      In the interests of protecting the public from further harm by Temme, Stewardship

and other entities he controls, the Commission brings this action, seeking temporary and

preliminary injunctions to immediately halt their conduct, a freeze over assets Temme and

Stewardship control, and an immediate accounting by Temme and Stewardship of assets under

their control and of their expenditures of investor funds, and a receiver to ensure proper handling

and preservation of any available assets.  The Commission further seeks permanent injunctive

relief against Temme and Stewardship, along with disgorgement of illegal profits, plus accrued

interest, and civil monetary penalties.

## JURISDICTION AND VENUE

8.      The investments Defendants offered and sold are "securities" under Section 2(1)

of the Securities Act [15 U.S.C. § 77b(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. §

78c(a)(10)].  For example, the limited partnerships Temme offered and sold are investment

contracts as that term has been judicially defined.  Purchasers of the limited partnership interests

were investing money in a common enterprise with the profits to come solely from efforts of

others.  For example, the agreements investors entered made clear that Temme and other parties

serving as general partners had responsibility for restructuring the nonperforming loans and

otherwise managing the enterprises' business and entitled investors to receiver returns based on

those efforts.

9.      The Commission brings this action under the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act

[15 U.S.C. § 78u(d)] to enjoin Defendants temporarily, preliminarily, and permanently from future violations of the federal securities laws.

10.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.     The Defendants have, directly or indirectly, made use of the means or instruments of transportation and communication, and the means or instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Defendant Temme is a resident of and can be found within the Eastern District of Texas and Defendant Stewardship has its principle place of business in the Eastern District of Texas.  Finally, certain of the transactions, acts, practices, and courses of business at issue occurred in the Eastern District of Texas.

## STATEMENT OF FACTS

### DEFENDANTS

12.     **Defendant Temme**, 42, resides in Plano, Texas.  Public records indicate that he is the registered agent, controls or is affiliated with entities acting as the managing general partner for multiple limited partnerships, including Stewardship.

13.     **Defendant Stewardship** is a Texas limited partnership with offices in Plano, Texas.  Stewardship is the general partner of various limited partnerships that have raised money from their limited partners for the purported purpose of investing in distressed mortgages and other related transactions.

<u>OVERVIEW OF TEMME'S INVESTMENT SCHEMES</u>

14.      Since at least 2008, Temme, acting through Stewardship and other entities, solicited and raised funds from investors.  Primarily, these funds were raised from investors who acquired limited partnership interests in limited partnerships purportedly formed to invest in non-performing residential mortgages and real properties.  Temme told investors he could acquire the nonperforming loans at a discount and that he would then (acting through Stewardship and/or general partners he controlled) work with the homeowner towards restructuring the non-performing loans into performing loans.  Temme told the limited partners they would be paid returns based on payment streams from the homeowners or from proceeds obtained when the general partner sold the now-performing mortgages or the underlying property.

15.      Since 2008, Temme has operated at least 16 different partnerships involving at least 31 entities and individuals.  He has raised more than $35 million through these securities offerings.

<u>TEMME FLOUTS PRIVATE EFFORTS TO HOLD HIM ACCOUNTABLE AND USES FUNDS FROM ONE GROUP OF INVESTORS TO PAY OFF ANOTHER GROUP OF INVESTORS</u>

16.      Since October 2010, Temme and Stewardship have been sued multiple times by different sets of investors in private state court actions.  In these private actions, different groups of investors have raised similar allegations.  For example, investors allege, among other things, that Temme and Stewardship had failed to pay promised returns, misappropriated investors' funds and misrepresented the use of proceeds from the investments. They further allege that Temme and Stewardship have failed to properly advise the investors concerning the status of their investments or respond to request for information regarding the mortgages Temme and Stewardship represented they were going to purchase, or had purchased, on behalf of the limited

partnerships in which the investors had invested.  These allegations appear to be consistent with the evidence developed during the Commission's emergency investigation.

17.     Far from curbing Temme's conduct, this piecemeal litigation has only generated more fraudulent representations from Temme to different investors.  Indeed, Temme appears undeterred even when private litigants obtain court orders designed to prevent Temme from moving money out of accounts he controls

18.     For example, on April 27, 2011, certain investors initiated litigation against Temme in a Texas district court in Dallas, in a case styled *Canadian Peso 21, et al. v. Stewardship Fund, LP*, et al, case no. DC-11-05254, District Court of Dallas County, Texas. This litigation centers on Temme's role (acting through certain entities he controls) as general partner in several limited partnerships.  The investor-plaintiffs in *Canadian Peso* allege that Temme and Stewardship had made a variety of misrepresentations in inducing them to invest approximately $19.8 million with him, and sought a variety of relief, including restrictions on Temme's transfer or disposition of cash and other liquid assets.

19.     After initially entering a temporary restraining order, the state district court in *Canadian Peso* entered an Agreed Amended Temporary Injunction on August 9, 2011.  The August 9, 2011 Agreed Amended Temporary Injunction prohibited Temme from taking any action to remove or seek the removal of any of the funds (other than for ordinary and reasonable business expenses, such as rent, utilities, and salaries of current employees) in any account over which Temme or other defendants in the litigation had control or signature authority, including without limitation certain Comerica accounts ending with 5394, 6746 and 5378, without the express, written consent of the plaintiffs or the written authorization of the Court.

20.     The Dallas district court's August 9, 2011 Agreed Amended Temporary Injunction further set a trial for November 28, 2011 and provided that the temporary injunction would remain in effect until any final judgment was rendered.

21.     However, as discussed in more detail below, on August 24, 2011, Temme caused at least two accounts to be opened at Legacy Texas Bank ("Legacy"). The first account was in the name of Stewardship Group, LLC, with an account number ending in 2479 ("the Stewardship Group LLC Legacy 2479 Account"). Temme was a signatory to that account. The second was in the name of Destiny Fund I, LP, having an account number ending in 2487 ("the Destiny Fund I, LP Legacy 2487 Account").

22.     Between August 26, 2011 and August 29, 2011, approximately $1.6 million was deposited into the Stewardship Group LLC Legacy 2479 Account. This $1.6 million represented funds received from an investor group that had, on August 26, 2011, entered into a limited partnership agreement with Temme called Stewardship Philanthropy Fund 4, LP ("SPF 4"). SPF 4 is a partnership whose limited partners are different from the investor-plaintiffs in the *Canadian Peso* litigation.

23.     On August 30, 2011, both the Stewardship Group LLC Legacy 2479 Account and the Destiny Fund I, LP Legacy 2487 Account were closed by Legacy due to questionable activity. Upon the accounts' closing, Temme obtained a cashier's check from Legacy Bank in the amount of approximately $1.6 million, which was the amount of money the SPF 4 investors had just invested into SPF 4.

24.     Despite the Dallas District Court's temporary injunction entered in the *Canadian Peso* litigation prohibiting the removal of funds from any account Temme controlled, Temme caused this $1.6 million cashier's check to be deposited into an account at another financial

institution, Texas Capital Bank, with an account number ending in 8011, in the name of

Stewardship Group, LLC. ("the Stewardship Group, LLC Texas Capital 8011 Account").

25.    Temme then used at least a portion of this money to pay more than $400,000 to a

third investor group, based in Illinois.  This is discussed in more detail below  paragraph 53.

26.    That was apparently not Temme's only transfer of funds while the asset freeze

remained in effect.  On October 11, 2011, the *Canadian Peso* investor-plaintiffs filed a motion

for contempt against Temme and Stewardship.  In addition to noting the initial transfer of the

$1.6 million received in August from the SPF 4 investors, the Canadian Peso investors allege

that on or about August 9, 2011 – the very day the temporary injunction was issued in the

*Canadian Peso* litigation – Temme attempted to wire $100,000 to different investors in an

apparent attempt to settle litigation.  They further allege that, two days later, on August 11, 2011,

Temme entered an agreed order (apparently acting *pro se*) in a case styled *Ten Lords, Ltd. v.*

*Comerica Bank* (Garnishee), Cause No. 366-03134-2011, 366th Judicial District Court, Collin

County, Texas, authorizing Comerica to pay $285,000 from accounts he controlled to another set

of investors that had sued him.

27.    In short, in the face of piecemeal efforts to hold Temme accountable for his

misrepresentations, Temme has repeatedly taken money obtained from one investor group and

paid it to another group that is applying pressure to him, even when state courts have issued

freezes that are designed to severely restrict the movement of his funds.

## TEMME FRAUDULENTLY OBTAINS $3.4 MILLION FROM AN ILLINOIS-BASED INVESTOR GROUP

28.    In early 2011, Temme pitched his investment scheme to a group of Illinois-based

investors, representing that he, acting through Stewardship, was forming a new limited

partnership, Equitas Housing Fund III, LP ("Equitas"). These Illinois-based investors, including several individuals and affiliated entities, will be referred to here as the "Equitas Investors."

### Temme Fraudulently Represents He Will Purchase Particular Mortgages

29.     In conference calls and in-person meetings in early 2011, Temme represented to the Equitas Investors that he was offering them the opportunity to acquire limited partnership interests in a limited partnership that would acquire a group of non-performing residential mortgages. These loans were specifically identified and were later referenced on an Exhibit to the ultimately-executed Equitas Housing Fund III, LP limited partnership agreement. The mortgages Temme represented would be acquired for the Equitas limited partnership will be referred to here as the "Equitas Mortgages." During the course of their discussions, Temme represented that the Equitas Mortgages would be purchased from an entity known as Home Solutions Partners, LP.

30.     Temme further explained to the Equitas Investors that Stewardship had a partnership arrangement with the Texas Servicing Company, a Texas-based public company that would service the Equitas Mortgages on behalf of the limited partnership (i.e., help modify the loans so that they were performing and/or sold to the underlying owner or third parties).

31.     During these communications in early 2011, Temme also represented to the Equitas Investors that their investments would be repaid from proceeds from the management or disposition of the Equitas Mortgages.

32.     Before investing in Temme's scheme, the Equitas Investors conducted certain due diligence. For example, they contacted the IAR referenced above, and he confirmed that he and other friends and contacts of his had invested with Temme and related entities.

33.     The Equitas Investors also contacted a representative of the company that they had been told was, at that time, servicing the loans on behalf of the putative seller, Home Solutions Partners, LP.  The loan servicing company told the Equitas Investors that it was servicing the loans.  It also told the Equitas Investors that the loans it was servicing were to be purchased by Stewardship.  Based on Temme's representations, the Equitas Investors understood that these loans would be part of the Equitas Mortgages to be purchased for the account of the Equitas limited partnership.

34.     Accordingly, the Equitas Investors, in April 2011, again based on Temme's representations, negotiated with him the terms of the limited partnership agreement, confirming that the capital contributions of the limited partners (i.e., the Equitas Investors) would be used to purchase the Equitas Mortgages.

35.     During the April 26 and 27 time frame, the parties agreed that Equitas Investors (as limited partners) would pay 10% of the purchase price of the Equitas Mortgages, which would be used by the party that would become the general partner of the Equitas partnership to service the Equitas Mortgages.

36.     Based on Temme's representations, the Equitas investors agreed to invest with Temme.  Temme insisted that the putative seller, Home Solutions Partners LP, required the purchase price be delivered immediately because Stewardship's contract with Home Solutions Partners LP provided for a closing date of April 26, 2011.  To support this claim, he provided the Equitas Investors with what appeared to be a signed agreement between Stewardship and Home Solutions Partners, LP.

37.     The putative purchase agreement reflected the purchase of the Equitas Mortgages by Stewardship from Home Solutions Partners, LP.  It reflected a closing date of April 26, 2011.

Temme signed the agreement on behalf of Stewardship. The document included the printed name and purported signature of an individual who is the President of Home Solutions Advisors, LLC ("HSA's President"), a management company that operates several partnerships that used the "Home Solutions" name, including Home Solutions Partners I, LP. The document made it appear that HSA's President had signed the agreement on behalf of the putative seller, Home Solutions Partners, LP. In turn, Temme and the Equitas Investors entered an agreement in which Temme, on behalf of Stewardship purported to assign the Equitas Mortgages to a holding company created by the Equitas Investors, with the understanding that the Equitas Mortgages would be transferred to Equitas once the partnership agreement was finalized.

38.     As discussed below and unknown to the Equitas Investors, the document Temme showed the Equitas Investors representing that he had purchased the Equitas Mortgages was a fraud and the Equitas Mortgages were not conveyed to the Equitas Investors or to Equitas. Accordingly, the representations by Temme and Stewardship to the Equitas Investors that Temme would acquire certain nonperforming residential mortgages on behalf of Equitas were materially false and misleading. These material misrepresentations were made beginning in early 2011, repeated again during late April 2011 and ultimately finalized in the limited partnership agreement executed by Temme, on behalf of Stewardship, and the Equitas Investors.

**The Equitas Investors Pay Temme Approximately $3.4 million**

39.     Based on Temme's misrepresentations and following his instructions, on April 27, 2011, the Equitas Investors collectively wired $3,139,667.20, representing their capital contributions. As instructed by Temme, they wired this money directly to a bank account at Comerica Bank that was purportedly in the name of Home Solutions Partners LP, the purported seller of the Equitas Mortgages. It was the Equitas Investors' understanding that these funds

would be used to acquire the Equitas Mortgages, which would then be transferred to Equitas and serviced by the Texas Servicing Company, in order to generate returns on the Equitas Investors' investments.  The Equitas Investors also wired $313,967.00 to the Texas Servicing Company, reflecting the agreement to pay 10% of the purchase price to cover expected servicing expenses.  Ultimately, the previous agreement to form Equitas was memorialized in a formal partnership agreement.

40.     As discussed below, contrary to Temme's representations, the approximate $3.1 million capital contribution was not used to obtain the Equitas Mortgages.

41.     For several months, the Equitas Investors were able to track information about the Equitas Mortgages they believed they owned on a website operated by the Texas Servicing Company.

**The Equitas Investors Learn They Have Been Misled**

42.     Although the information on the Texas Servicing Company website appeared to reflect that the Texas Servicing Company had been servicing the Equitas Mortgages, the Equitas Investors learned in late August 2011 that, in fact, HSA's President knew nothing about the purported transfer of the Equitas Mortgages, that there was no entity known as Home Solutions Partners, LP (the name Temme had supplied as the purported seller), and that the HSA President's purported signature on the document purporting to show Stewardship's purchase of the Equitas Mortgages was a forgery.  In short, the Equitas Investors learned that, contrary to the representations of Temme and Stewardship, the Equitas Mortgages had never been sold to the Equitas Investors or otherwise procured for the benefit of Equitas.

43.     When the Equitas Investors and, separately, HSA's President, confronted Temme with these facts, he did not deny that he forged HSA's President's signature; rather, Temme

agreed to return the Equitas Investors' money.  Likewise, although Temme has admitted he was aware of the putative purchase contract in which Stewardship was represented as purchasing the Equitas Mortgages, Temme has not denied that the Equitas Mortgages were never transferred to Equitas or the Equitas Investors.  In fact, at least six of the properties that appear on the list of properties that were supposed to be purchased on behalf of Equitas are identified as having been acquired by another limited partnership organized by Temme.

### Temme Continues to Try to Hide His Fraud

44.       Instead, on August 26, 2011, Temme assured the Equitas Investors that their investment had been sent to an individual named "Karl Koch" and that Koch was buying the rest of the mortgage portfolio of the Equitas Seller. Although Temme provided what he claimed was a phone number for Koch, neither the Equitas Investors nor staff of the Commission have been able to reach Koch by telephone or verify his existence, despite repeated attempts.  In fact, HSA's President -- who during August 2011 was closely familiar with the activities of reported Equitas Seller and whose name was forged on the purchase contract referenced above – does not know Koch.  Moreover, as HSA's President investigated the forged purchase agreement and the status of the Equitas Mortgages, Temme claimed to HSA's President that Koch was a friend of one of the Equitas Investors.  This is not true, as the Equitas Investors do not know if "Koch" even exists.

45.       Temme also provided the Equitas Investors with what he claimed was a copy of a Legacy wire transfer form, purporting to show that he had attempted to wire back all of their money.  Again, this document was a fraud.  No such form was presented to Legacy and, even if it had, Temme did not have even close to sufficient funds in any Legacy account to fund such a transfer.

46.     Regardless, Temme has not returned the bulk of the more than the $3 million paid to him by the Equitas Investors. Yet, as recently as October 4, 2011, Temme assured the Equitas Investors by text message that "[w]e have been working through some final issues that will allow the funds to be released to you …. [a]s soon as the funds are released and headed your way, I will send you another text."

**Temme Uses The Funds from the Equitas Investors
to Pay Off Different Entities**

47.     The Commission staff has worked to trace Temme's actual disposition of the $3.1 million he received from the Equitas Investors. As discussed above, Temme directed the Equitas Investors to wire their approximately $3.1 million capital contribution into a Comerica bank account. However, the account the funds were wired to was not in the name of "Home Solutions Partners, LP," which is a non-existent entity, but rather to Home Solutions Partners I, LP.

48.     Home Solutions Partners I, LP is a partnership that was operated by HSA and HSA's president for the benefit of its own investors. Temme was not a general partner in Home Solutions Partners I, LP. However, he had a service contract with Home Solutions Partners I, LP that provided him signatory authority over its bank account at Comerica. Neither Home Solutions Partners I LP nor its general partner had authorized Temme to use the account for business unrelated to his service contract. Moreover, prior to April 27, 2011 the account had been dormant, because, at Temme's request, Temme and the President of HSA had agreed to use a different bank account for business relating to Home Solutions Partners I, LP. Perhaps recognizing that the account was not regularly monitored by the HSA president or his staff, Temme used the account as a pass through to give the Equitas Investors the impression they were investing in assets acquired from a Home Solution entity.

49.     The same day the approximately $3.1 million capital contribution from the Equitas Investors was deposited into the Home Solutions Partners I LP account, Temme immediately wired it out of the account and into another Comerica account that was in the name of Destiny Fund II, LP.  Temme is a signatory to and has control over the Destiny Fund II Comerica Account. HSA's President had not been aware of the deposit to the Home Solutions Partners I, LP account or the immediate transfer of funds to the Destiny Fund Comerica Account until he checked the account records on or about October 5, 2011, in response to an inquiry from the Commission staff.

50.     Ultimately, rather than using the $3.1 million to buy the Equitas Mortgages as he had represented, Temme used at least a portion of the $3.1 million capital contribution from the Equitas Investors to pay other parties.

51.     For example, in December 2009, Temme and Stewardship had agreed to sell certain foreclosed homes to another Home Solutions partnership in exchange for $1,562,875. After the partnership had funded the agreement, there was a long delay during which Temme failed to provide the partnership with the deeds confirming that the titles to the properties had actually been conveyed.  In fact, according to HSA's President, title to those properties was never conveyed to the partnership.  Accordingly, the partnership demanded that Temme repay the purchase price, plus certain additional costs that had been incurred.  In May 2011, Temme paid the partnership $1,821,306, representing the paid purchase price, plus compensation for the costs the partnership had occurred.

52.     The funds Temme used to fund this approximately $1.8 million payment were wired from the same Destiny Fund II Comerica account to which Temme had transferred the Equitas Investors' approximately $3.1 million capital contribution.

53.     In addition, in April 2011, Temme transferred $1.4 million from the Destiny Fund II Comerica Account to another Comerica account, in the name of Stewardship.  Temme was a signatory on that account.  He subsequently used funds from this account to make distributions to investors in other investment schemes and/or payments to investor-plaintiffs who had filed or were threatening to file litigation against him.

**Having Dispersed the Equitas Investors' Funds for Unrelated Purposes, Temme Fleeces a New Group of Investors to Partially Repay the Equitas Investors.**

54.     While using the money he received from the Equitas Investors for other purposes, Temme attempted to placate the Equitas Investors' demands by paying them a partial refund of $419,966.72.  On August 31, 2011, the Equitas Investors received a wire for $313,966.72 (representing the money they had paid for servicing expenses) and another wire on September 2, 2011, for $106,000.  In fact, however, these funds were not taken from the funds paid by the Equitas Investors.  Instead, these wire transfers were funded by funds Temme obtained from a separate group of investors in the SPF 4 limited partnership, as discussed further below.

55.     In sum, the repeated representations by Temme and Stewardship that they would use the Equitas Investors' funds to purchase the Equitas Mortgages were materially false.  Moreover, they misappropriated the $3.1 million paid to them by the Equitas Investors.  Specifically, though Temme and Stewardship accepted payment of approximately $3.1 million from the Equitas Investors in order to purchase those particular mortgages and an additional approximately $313,000 that was putatively to be used to service those mortgages, Temme never used those investor funds to purchase the promised mortgages on behalf of Equitas Investors.f Despite repeated efforts by the Equitas Investors, Temme and Stewardship have failed to return the bulk of those funds.  Instead, they have used the funds to make distributions to other parties.

Finally, in order to obtain the approximately $420,000 he has sent back to the Equitas investors, Temme and Stewardship simply fleeced a new group of investors.

## TEMMES DEFRAUDS AN INVESTMENT GROUPS ADVISED BY AN IAR OF A MAJOR INVESTMENT BANK

56.     On August 26, 2011, various entities and individuals that received investment recommendations from the IAR acquired limited partnership interests in SPF 4.  The limited partners in SPF 4 included a limited liability company controlled by the IAR's spouse, an entity controlled by the IAR's brother, several clients and employees of the major investment bank at which the IAR worked.  It appears that the IAR was providing recommendations in his personal capacity and not on behalf of the Major Investment Bank.

57.     Before this, throughout January 2011 through August 2011, in various in-person meetings and teleconferences, Temme explained to the IAR and SPF 4 investors that he was in the business of purchasing nonperforming residential mortgages, working with the homeowners to restructure the terms of their indebtedness so that they could make their monthly payments, and then reconstituting those previously nonperforming loans into packages of performing loans. Temme also represented during this time period that the various portfolios of these assets would be placed into separate limited partnerships, and that each limited partnership's assets (including proceeds from the management or disposition of the mortgages) would be segregated and would not be commingled with any other limited partnership's assets.  These representations were also included as part of the limited partnership agreement.

58.     SPF 4 was supposedly managed by an entity known as Halo Asset Management Genpar I, LLC ("Halo Genpar").  Halo Genpar had been jointly formed by Temme and the Texas Servicing Company (the same company referenced in the paragraphs above regarding Temme's fraud in connection with Equitas) for the purpose of creating various investment funds.

59.     The SPF 4 investors wired their collective capital contribution of approximately

$1.6 million to an account in the name of Stewardship Group, LLC at Legacy Texas Bank

between August 26 and August 29, 2011.  Temme was a signatory to that account.  This was the

only activity in this account, other than an opening deposit and a $15,000 disbursement for rent.

60.     However, contrary to the representations by Temme made in the limited

partnership agreement (which identified Halo Genpar as the general manager), the Texas

Servicing Company had transferred control of Halo Genpar to Temme in July 2011.  Halo

Genpar's name was changed at that time to Stewardship Asset Management Genpar I, LLC.

61.     Therefore, when the SPF 4 investors invested, the Texas Servicing Company was

not involved in the partnership.  Nevertheless, Temme signed the SPF 4 limited partnership

agreement purportedly on behalf of the Texas Servicing Company, giving the materially false

impression that the Texas Servicing Company remained involved in the partnership.  In fact, the

Texas Servicing Company was unaware of this offering or that SPF 4 had been launched.

62.     Under the terms of the SPF 4 partnership agreement, and in accordance with other

representations made by Temme, the SPF 4 investors' payments were supposed to be used by the

general partner to acquire certain particularly identified distressed mortgages.

63.     The partnership agreement also obligated the general partner to provide certain

periodic reports to the limited partners and to make to the limited partners quarterly distributions

of the amounts received from the homeowners.  Despite these obligations, the SPF 4 limited

partners have not received any distributions to date.  Moreover, despite demands from the limited

partners, Temme has refused to account for their funds or provide other information regarding

the mortgages supposedly acquired by the partnership.

64.     In September 2011, the SPF 4 investors and the IAR became concerned when one of the limited partners' investments was mistakenly double-wired to Temme and his Stewardship entities, yet Temme failed to return the duplicative payment despite a request that he do so.  The investors' concerns were amplified when they learned of other litigation against Temme.

65.     Accordingly, the SPF 4 investors asked Temme to explain the lawsuits and to provide specific information regarding Temme's use of the SPF 4 investors' proceeds.  Temme failed to provide the requested information.

66.     Moreover, rather than using the proceeds he obtained from the SPF 4 investors to obtain the nonperforming mortgages that he had represented he would, Temme attempted to wire more than $400,000 to the Equitas Investors and to a separate group of investors.

67.     Later, after Legacy Texas Bank closed his account, Temme transferred the SPF 4 funds to an account at Texas Capital Bank on August 31, 2011.  That same day, he sent $313,966.72 to the Equitas Investors and he sent another $106,000 on September 2, 2011.

## FIRST CLAIM

### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

68.     Plaintiff Commission re-alleges and incorporates paragraphs 1 through 67of this Complaint by reference as if set forth *verbatim*.

69.     Defendants James G. Temme and Stewardship, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have:  (a) employed devices, schemes, and artifices to defraud;  (b) obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and  (c)  engaged in transactions,

practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

70.     As a part of and in furtherance of their scheme, the Defendants James G. Temme and Stewardship, directly and indirectly, prepared, disseminated, or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 67 above.

71.     With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, Defendants James G. Temme and Stewardship were, at a minimum, negligent in their actions regarding the material representations and omissions alleged herein.  With respect to violations of Section 17(a)(1) of the Securities Act, the Defendants made the above-referenced material misrepresentations and omissions knowingly or with severe recklessness regarding the truth.

72.     By reason of the foregoing, Defendants James G. Temme and Stewardship have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

73.     Plaintiff Commission re-alleges and incorporates paragraphs 1 through 67 of this Complaint by reference as if set forth *verbatim*.

74.     Defendants James G. Temme and Stewardship, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means

and instrumentalities of interstate commerce and by use of the mails have:  (a) employed devices, schemes, and artifices to defraud;  (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and  (c)  engaged in acts, practices, and courses of business which operate or would operate as a fraud and deceit upon purchasers, prospective purchasers, and any other persons.

75.    As a part of and in furtherance of their scheme, Defendants James G. Temme and Stewardship, directly and indirectly, prepared, disseminated, or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 67 above.

76.    Defendants James G. Temme and Stewardship made the above-referenced material misrepresentations and omissions knowingly or with severe recklessness regarding the truth.

77.    By reason of the foregoing, Defendants James G. Temme and Stewardship violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5  [17 C.F.R. § 240.10b-5].

**RELIEF REQUESTED**

Plaintiff respectfully requests that this Court:

**I.**

Temporarily, preliminarily, and permanently enjoin the Defendants from violating the federal securities laws described in the above claims.

**II.**

Order the Defendants to disgorge an amount equal to the funds and benefits they obtained illegally, or to which they do not have a legitimate claim or entitlement, as a result of the violations alleged, plus prejudgment interest on that amount.

**III.**

Order the Defendants to pay civil monetary penalties in an amount determined as appropriate by the Court pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] for the violations alleged herein.

IV.

Order such further relief as this Court may deem just and proper, including but not

limited to the emergency relief sought in the contemporaneously filed Application for Temporary

Restraining Order and Other Emergency Relief.

Dated:  October 14, 2011                    Respectfully submitted,


DAVID B. REECE
Lead Attorney
Texas Bar No. 24002810
SECURITIES AND EXCHANGE
COMMISSION
Fort Worth Regional Office
801 Cherry Street, 19th Floor
Fort Worth, Texas 76102
(817) 978-6476
(817) 978-4927 (fax)
reeced@sec.gov