**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| | § | **Civil Action No. 4:11-cv-655** |
| | § | |
| **v.** | § | |
| | § | |
| **JAMES G. TEMME, and** | § | |
| **STEWARDSHIP FUND, LP,** | | |
| **Defendants.** | | |

**RECEIVER'S STATUS REPORT**
(June, 2016)

COMES NOW, Keith M. Aurzada as Receiver (the "**Receiver**") for James G. Temme ("**Temme**"), Stewardship Fund, LP, and all other entities directly or indirectly controlled by James G. Temme or Stewardship Fund, LP, including, but not limited to Stewardship Advisors, LLC, d/b/a Stewardship Advisors, LP, Stewardship Asset Management Genpar I, LLC, Stewardship Group, LLC, Destiny Fund, LP, and Stewardship Management, LP (collectively, the "**Defendants**") and hereby files his Receiver's Status Report.

**I.**

**BACKGROUND**

1.      On October 14, 2011, the Securities and Exchange Commission instituted the above-captioned action, alleging that Defendants used fraudulent, or otherwise unlawful, means to raise at least $35 million from investors through the offering and selling of interests in limited partnerships and mortgage notes.

2.      On October 14, 2011, the Receiver was appointed as receiver for the Defendants

through the Court's entry of the Agreed Order Appointing Receiver Over Entities Under Control of James G. Temme (Dkt. No. 24), Agreed Order Appointing Receiver Over Stewardship Fund, LP, and Related Entities (Dkt. No. 25), and Order Appointing Receiver Over James Temme (Dkt. No, 30) ("**Receiver Orders**").  Pursuant to the Receiver Orders, the Receiver is to take exclusive custody and control of all assets and records of, or traceable to, the Defendants.

3.      As the Receiver has conducted his investigation, it has become apparent that in offering and selling interests in notes and limited partnerships, the Defendants made material misrepresentations to investors regarding the value of the interests, the assets owned or to be purchased on behalf of investors, and the expected returns on such investments.  It has also become apparent that Defendants frequently failed to complete basic due diligence and complete the necessary paperwork to acquire and sell the interests and notes they purportedly sold to investors.  Moreover, the assets that were allegedly transferred to Defendants (in the form of promissory notes secured by residential real estate) frequently were the subject of municipal enforcement actions and liens for unpaid assessments and taxes. Furthermore, the Receiver took possession of many checks from borrowers that had not been cashed, some many months old.

## II.

## Summary of Operations of Receiver

## A.      Employment of Professionals

4.      Immediately following his appointment, it became necessary for the Receiver to employ Bryan Cave LLP ("**BC**") as his counsel.   The Receiver and BC have performed substantial work administering the Receivership Estate, pursuing claims and assets of the estate, and identifying investors in the Defendants.   The Receiver and BC's efforts are summarized more fully below.

5.      As the Receivership progressed, it became necessary for the Receiver to hire an accountant to assist with day-to-day accounting needs.  Accordingly, with the Court's approval, the Receiver hired Greg T. Murray, CPA ("**Murray**") as an accountant for the Receiver.  *See* Order Granting Unopposed Application to Employ Greg T. Murray as Accountant for Receiver [Dkt. No. 45].  Mr. Murray and his staff have spent several hundred hours on various tax matters, reconciling bank statements, assisting with forensic examination of records, reviewing and reconciling claims, and maintaining accounts and other accounting issues.  *See, e.g.,* Amended First Interim Application to Allow and Pay Professional Fees to Greg T. Murray, PLLC [Dkt. No. 138].

6.      At the request of the Stewardship Receivership Claimants Association (the "**Association**"), the Receiver retained Wingspan Portfolio Advisors, LLC ("**Wingspan**") to analyze the Receivership Assets to determine the best course of action including, but not limited to, whether it is in the best interest of the Estate to sell the assets immediately or service the assets for a period of time and then sell them.  Based on its independent assessment, Wingspan determined that it was in the best interest of the Estate to immediately sell the Receivership Assets.  As described below in more detail, the Receiver filed a motion to sell the assets, which was delayed by the objection of the Association.  The Receiver has now filed another motion to sell the remaining assets in the Estate.  *See* Motion for Authority to Sell or Abandon Real and Personal Property and Approve Sales Procedures [Dkt. No. 349].

7.      The Receiver has also engaged Jeffrey Goldfarb as contingency fee counsel to analyze and evaluate certain potential causes of action belonging to the Receivership Estate.  *See* Notice of Appearance of Additional Counsel [Dkt. No. 87].  Mr. Goldfarb has successfully settled potential litigation claims against several third-parties, including the MCS Parties

resulting in a payment to the Estate of over $1.3 million, American Mutual, LLC resulting in a payment of $50,000 to the Estate, the HSP Entities resulting in a payment of $550,000 to the Estate, and the Finch & Barry Group (each of which is described below).

8.     The Receiver has also engaged Andrew Whitaker with Figari and Davenport, LLP to investigate potential causes of action against multiple escrow companies that worked with the Defendants.  Mr. Whitaker successfully assisted the Receiver to settle potential litigation claims against two escrow and title companies (described in more detail below).

9.     The Receiver has also retained Logos Data Services ("**Logos**") to maintain and restore data from the Defendants' server.  Logos maintained and preserved the Defendants' electronic information.  Because the Receiver believes that the data maintained by Logos is no longer current enough to be useful to the administration of the Estate, the Receiver has coordinated with Logos to permanently preserve such information without the need for ongoing maintenance and the associated monthly expense.  All historic data maintained by Logos has been transferred onto an external hard drive that is being stored by a third-party vendor in a secure vault.

**B.     Identity, Location, And Value Of Receivership Assets And Liabilities Pertaining Thereto.**

10.     As part of his duties, the Receiver is tasked with identifying, locating, and valuing Receivership Estate assets and executing on those assets for the benefit of the estate.  The Receiver's efforts to identify and liquidate Estate assets are summarized below.

**(i)     Interest in P38**

11.     Through his investigation, the Receiver identified an entity known as P38 Holdings, LLC ("**P38**"), the original ownership of which was held 10% by Wingspan Portfolio Advisors, LLC; 45% by Charles A. Vose III ("**Vose**"); and 45% by TREI II Holdings, LLC

("**TREI II**").   The Receiver further identified TREI II as an entity directly or indirectly controlled by Defendants and, as such, a part of the Receivership Estate.  The Defendants did not inform the Receiver of this transfer or the existence of the assets owned by P38.

12.     On or about August 17, 2011, TREI II agreed to transfer its 45% interest in P38 to Vose (the "**P38 Transfer**").  In consideration for the P38 Transfer, TREI II received from Vose a 5% interest in Stewardship Management, LP, which was held by another entity owned by Vose, Southwest Federation North Texas, LP.

13.     The Receiver does not believe that the P38 Transfer was for reasonably equivalent value and, therefore, believes that the P38 Transfer is an asset of the Receivership Estate.  The Receiver, thus, contacted Vose and reached a settlement whereby Vose agreed to assign his interest in the P38 Transfer to the Receiver; relinquish the 5% partnership interest in Stewardship Management, LP that was transferred to TREI II; and relinquish to the Receiver the $5,264.71 in distributions received from P38 [Dkt. No. 69].

14.     Throughout the case, the Estate received periodic small distributions arising from the Estate's interest in P38.   In an effort to wind-down the administration of this case and liquidate the Estate's remaining assets, the Receiver endeavored to sell the Estate's interest in P38 and filed a motion with the Court [Dkt. No. 374]. As part of those efforts, the Receiver contacted the members of P38 to solicit offers. Chad Vose, a 45% interest holder, made a written offer to acquire the Estate's 45% interest in P38 for $1,000. Although the Receiver believed that $1,000 was a fair price based on the few remaining assets of P38, the Receiver proposes to auction the Estate's interest in P38 and used the $1,000 offer from Vose as an initial bid.

15.     On August 21, 2015, the Receiver held an auction for the Estate's interest in P38. The Receiver did not receive any other bids except the initial bid from Vose.  On August 21,

2015, the Receiver filed a Notice of Sale [Dkt. No. 282] with the Court and the Estate's interest in P38 was sold to Vose for $1,000.

    **(ii)**    <u>**The Substitute Assets**</u>

    16.    The Receiver located more than 130 Substitute Assets that he has recovered for the benefit of the Estate.  The Substitute Assets were acquired through a settlement with Stewardship Fund No. 2, L.P., Stewardship Fund No. 3, L.P., Stewardship Fund No. 4, L.P. and Stewardship Fund No. 5, L.P (collectively, the "**Mt. Vernon Entities**").  The Receivership Estate owned a forty percent (40%) limited partnership interest in each of the Mt. Vernon Entities.  The Mt. Vernon Entities acquired assets from one or more of the Defendants through a series of Asset Disposition Agreements that list certain mortgages that were to be purchased on behalf of the limited partnerships.  However, certain assets described in the Asset Disposition Agreements were not identified in the original limited partnership agreements (the "**Substitute Assets**").  As such, the Receiver contended that the Estate may have a claim to take title to the Substitute Assets by virtue of a fraudulent conveyance claim.  The Mt. Vernon Entities disagreed and asserted that they were entitled to ownership.  Based on the Receiver's potential claim to the Substitute Assets, the Mt. Vernon Entities entered into a settlement whereby the Estate was granted a 40% profits interest in the Substitute Assets in exchange for the Mt. Vernon Entities' continued efforts to preserve the value of the Substitute Assets.  *See* Order Granting Receiver's Emergency Motion to Approve Asset Disposition Agreement [Dkt. No. 63].

    17.    The Substitute Assets have been fully liquidated and the Estate has received its 40% profits interest in the Substitute Assets from the Mt. Vernon Entities.

    **(iii)**    <u>**Assets Received from the Boyce Parties**</u>

    18.    Through his investigation, the Receiver learned that in 2011, Robert and Elizabeth

Boyce and ER, LLC (collectively the "**Boyce Parties**") advanced $1.3 million to one or more of the Defendants.  In return, the Boyce Parties received $250,000 in cash, oil and gas leases of undetermined value, and 71 properties (mostly REO).  In December of 2011, the Boyce Parties sold 53 of the properties for net proceeds of approximately $650,000, leaving 18 properties in their possession (the Receiver believes that the properties have a value of approximately $50,000).

19.     The Receiver believed that the Estate had claims against the Boyce Parties arising out of their transactions with the Defendants.  Accordingly, the Receiver contacted the Boyce Parties and reached a settlement whereby the Boyce Parties agreed to transfer to the Receiver the 18 properties acquired from Defendants, transfer to the Receiver oil and gas leases and the associated overriding royalty interests, and pay the Receiver $50,000 [Dkt. Nos. 80 and 95].  The Receiver has received the deeds to the REO properties, a $25,000 payment, and the oil and gas leases. The 18 properties are currently being marketed for sale by Barrier.

20.     The oil and gas leases were marketed for sale by Simplex.  Despite marketing the oil and gas leases for several months, Simplex was unable to procure a buyer for the leases.  As a result, the Receiver filed, and the Court granted, a motion to allow Simplex to continue attempting to market the oil and gas leases or to abandon them [Dkt. No. 284].  On February 27, 2014, the Receiver held a public auction of the oil and gas leases on the courthouse steps.  The auction was publicly advertised on the Receivership website and in the Dallas Morning News, Houston Chronicle, and Amarillo Globe-News.  Despite the widespread publication of the auction, there were no bidders.  The Receiver remains willing accepting offers for the oil and gas leases and has provided information to potential buyers.  However, the term of many, if not all,

of the oil and gas leases has terminated and the remainder will terminate in the near future.  As a result, the Receiver does not anticipate receiving offers on the oil and gas leases.

**(iv)**     **Assets Received from the Harbour and Cavco Entities**

21.     Through his investigation, the Receiver determined that in July 2008, Harbour Portfolio I, LLC ("**Harbour I**") and Harbour Portfolio II, LLC ("**Harbour II**") attempted to purchase from Defendants 221 and 172 distressed real estate mortgages and corresponding notes for $2,032,395.69 and $1,321,103.80 respectively.   As part of the transaction, each of the mortgages should have been assigned to Harbour I and Harbour II (and the assignments recorded) and an allonge should have been executed for each note indicating that Harbour I and Harbour II were the new holders of the notes.  Although the transactions closed in 2008, few, if any, of the mortgage assignments or allonges were ever executed or recorded.  As a result, the Receiver claimed an interest in the remaining mortgages and notes owned by Harbour I and Harbour II.

22.     Similarly, in February 2010, Harbour Portfolio IV ("**Harbour IV**") attempted to purchase 199 distressed real estate mortgages and corresponding notes for a purchase price of $645,000 and from March 2009 to June 2010, Cavco Holdings, LLC ("**Cavco**") attempted to purchase 203 distressed real estate mortgages and corresponding notes for a total purchase price of approximately $917,000.  As with Harbour I and Harbour II, Harbour IV and Cavco failed to properly assign and transfer the mortgages and notes.  As a result, the Receiver claimed an interest in the mortgages and notes owned by Harbour IV and Cavco.

23.     Based on the Receiver's potential claims, Harbour I, Harbour II, Harbour IV, and Cavco entered into settlement agreements with the Receiver [Dkt. No. 79].  Under the settlement agreements, Harbour I agreed to transfer its interest in eighty (80) mortgages and notes to the

Receivership Estate; Harbour II agreed to transfer its interest in thirty seven (37) mortgages and notes to the Receivership Estate; Harbour IV and the Receiver agreed to divide the net proceeds from sale of Harbour IV's assets  40% to the Receivership Estate and 60% to Harbour IV; and Cavco and the Receiver agreed to divide the net proceeds from sale of Cavco's assets 40% to the Receivership Estate and 60% to Cavco.

24.     Based on the Receiver's settlements with Cavco and Harbour IV, the Estate has received in excess of $14,000 from Harbour IV and in excess of $30,000 from Cavco. The Receiver anticipates receiving additional funds, however, the amount will likely be *de minimis*.

25.     The settlements with Harbour I and Harbour II resulted in the Estate acquiring over 100 mortgages, notes, and REO properties, which the Receiver listed for sale.  As described in Section (iv), the Lakeside Assets ultimately resulted in a payment of $450,000 to the Estate. As a result, the settlements with Harbour Entities will result in a recovery of approximately $500,000 for the Estate

26.     Throughout the case, the Estate received distributions from Cavco when assets were sold.  However, as of June 2015, Cavco owned 10 assets that it had not been able to sell.  In an effort to wind-down the administration of this case and liquidate the Estate's remaining assets, the Receiver endeavored to sell the Estate's profits interest in Cavco and filed a motion with the Court [Dkt. No. 374]. As part of his efforts to sell the Estate's interest in Cavco, the Receiver contacted Cavco to solicit an offer. Cavco has made a written offer to acquire the Estate's 40% profits interest for $1,500. Although the Receiver believed that $1,500 was a fair price, the Receiver proposes to auction the Estate's interest in Cavco and used the $1,500 offer as an initial bid.

**Receiver's Status Report**                                              9

27. On August 21, 2015, the Receiver held an auction for the Estate's interest in Cavco. The Receiver did not receive any other bids except the initial bid. On August 21, 2015, the Receiver filed a Notice of Sale [Dkt. No. 282] with the Court and the Estate's interest was sold to Cavco for $1,500.

**(iv)    The Lakeside Assets**

28. The assets received from settlements with the Harbour and Cavco entities were marketed for sale through Halo Companies, Inc. ("**Halo**"). In August 2012, Halo assisted the Receiver in identifying a potential buyer (Lakeside Portfolio Management, LLC) for the assets received from Harbour and Cavco (referred to as the "**Lakeside Assets**") for $195,000. The Receiver, therefore, filed a motion requesting that the Court authorize the sale to Lakeside, subject to public marketing and a public auction (the "**Lakeside Sales Motion**").

29. The Association objected to the sale of the Lakeside Assets (which were non-performing mortgages), alleging that the assets were more valuable if they were held by the Receiver and sold at a later date as performing mortgages.[1] The Association also requested that the Receiver retain Wingspan to evaluate whether it was in the Estate's best interest to immediately sell the Lakeside Assets or hold them for sale later. The Receiver paid Wingspan $75,000 to evaluate the Lakeside Assets. Wingspan concluded that it was in the Estate's best interest to immediately sell the Lakeside Assets and concluded that the sales price of $195,000 was a fair price.

30. Before the sale to Lakeside was approved by the Court, on November 27, 2012, the Receiver received a non-binding letter of intent from HP Debt Exchange, LLC ("**HP**") to purchase the Lakeside Assets for $250,000 (the "**Letter of Intent**"). The Receiver contacted HP

---

[1] Other investors objected to the Lakeside Sales Motion. However, all objections were resolved except the objection of the Association.

to facilitate a sale at the higher price.  Unbeknownst to the Receiver, after HP offered to purchase the Lakeside Assets from the Estate, it fraudulently purported to sell the Lakeside Assets to Mark Torok and related entities for $450,000.  The $450,000 price was based on false representations by HP and its principal, Chris Ganter, regarding the quality and nature of the Lakeside Assets.  It was those misrepresentations that garnered an offer of $450,000 for the Lakeside Assets.  The Receiver continued to receive offers to purchase the Lakeside Assets, but (other than HP) no offer was greater than the $195,000 originally offered by Lakeside.

31.     Upon learning about the fraudulent sale, the Receiver filed a motion for contempt against HP and sought disgorgement of the $450,000 paid by Torok.  The motion was granted and HP was ordered to disgorge the $450,000 it received from Torok into the Court registry. The Court subsequently disbursed the $450,000 that was disgorged from HP to the Estate.

**(vi)     <u>The Lake House</u>**

32.     Through his investigation, the Receiver located a lake house in Bonham, Texas titled in the name of Mr. and Mrs. Temme.  As with other assets of the Estate, Mr. Temme did not voluntarily disclose the existence of the lake house.  When the Receiver inquired as to the current ownership of the lake house, the Temmes alleged that it had been sold prior to the Receivership and produced a partially handwritten sales contract.  On information and belief, the sales contract was fraudulent and, as a result, on October 1, 2013, the Receiver filed and the Court granted a Motion for Authority to (i) Assign Lease; (ii) Sell Real Property; (iii) Approve Sales Procedures; (iv) Enter into Listing Agreement and Request for Service by Publication [Docket No. 273].  As a result, the Receiver retained a real estate broker, who listed the lake house for sale for $125,000.  The Receiver received three offers to purchase the lake house, and

accepted the highest all-cash offer of $126,000.  The sale of the lake house resulted in a cash gain of over $105,000 for the Estate.[2]

**(vii)**     **Anglers and Hunters, Inc.**

33.     Through his investigation, the Receiver determined that the Estate has an interest in Angler and Hunters, Inc., a now defunct entity owned or controlled by Temme.  Although Anglers and Hunters, Inc. is no longer operating, the Receiver identified a bank account owned by Anglers and Hunters that contained $19,988.36.  The Receiver has acquired the funds in the account and closed the account.

**(viii)**     **Other Assets of Defendants**

34.     Through his investigation, the Receiver located a personal retirement account owned by Temme.  The Receiver filed a motion to liquidate the account, which was granted by the Court [Docket No. 165].  As a result, the Receiver received a payment of $64,983.36 representing the contents of the retirement account.  That amount, however, was $15,000 less than the Receiver anticipated based upon financial statements in the Receiver's possession.  Upon written demand, Temme returned $15,000 that was previously withdrawn from the retirement account without authorization.

**C.**     **Litigation Claims and Settlements**

**(i)**     **Mt. Vernon Entities Settlement**

35.     As described more fully in Section B(ii), the Receiver entered into an Asset Disposition Agreement with the Mt. Vernon Entities that resulted in the Estate taking a profits

---

[2] The sales proceeds of $125,000 were used to pay costs associated with the sale of the lake house, including a 6% sales commission to the real estate agent and paying off of an approximately $8,000 loan secured by the lake house.

interest in 130 Substitute Assets.[3]   The Substitute Assets were purportedly owned by the Mt. Vernon Entities based on a series of Asset Disposition Agreement with the Defendants prior to the Receivership.   Because, the Substitute Assets were not identified in the original limited partnership agreements, the Receiver contends that the Estate may have a claim to take title to the Substitute Assets by virtue of a fraudulent conveyance claim.   In order to avoid litigating the ownership of the Substitute Assets, the Mt. Vernon Entities agreed to provide the Estate a 40% profits interest in the Substitute Assets in exchange for the Mt. Vernon Entities' continued efforts to preserve the value of the Substitute Assets.   *See* Order Granting Receiver's Emergency Motion to Approve Asset Disposition Agreement [Dkt. No. 63]

36.     The Substitute Assets have been fully liquidated and the Estate has received its 40% profits interest in the Substitute Assets from the Mt. Vernon Entities.

### (ii)     Harbour and Cavco Settlements

37.     As described more fully in Section B(iv), the Receiver entered into a Settlement Agreement with the four Harbour and Cavco entities.   Prior to the Receivership, the Harbour and Cavco entities attempted to purchase several packages of distressed real estate mortgages and promissory notes from the Defendants.   As part of his investigation, the Receiver determined that the transfers of ownership of the mortgages and notes were improperly documented.   As a result, the Receiver claimed an interest in the mortgages and notes and threatened litigation against the Harbour and Cavco entities.

38.     Based on the Receiver's potential claims, the Harbour and Cavco entities entered into settlement agreements with the Receiver [Dkt. No. 79] in which the Estate received over 100 mortgages and notes (later sold as the Lakeside Assets) and a 40% profits interest in several

---

[3] The Mt. Vernon Entities include Stewardship Fund No. 2, L.P., Stewardship Fund No. 3, L.P., Stewardship Fund No. 4, L.P. and Stewardship Fund No. 5, L.P.

hundred other mortgages and notes.  The disposition of the Lakeside Assets will result in a payment of $450,000 to the Estate.  The 40% profits interest in the other assets owned by the Harbour and Cavco entities has resulted in payments to the Estate totaling nearly $45,000.

39.     At this time, the Receiver has liquidated all of the Estate's interest in Harbour and Cavco and all disputes with the Harbour and Cavco have been resolved and settled.

**(iii)     Boyce Settlement**

40.     As described more fully in Section B(iii), the Receiver entered into a Settlement Agreement with the Boyce Entities.  Prior to the Receivership, the Boyce Parties entered into several agreements with the Defendants to acquire mortgages and promissory notes.  Based on the failure to properly documents such transaction, the Receiver alleged claims against the Boyce Parties and sought to recover the assets they acquired from the Defendants.  In order to avoid litigating the ownership of assets acquired from the Defendants, the Boyce Parties entered into a settlement agreement with the Receiver in which the Estate received 18 REO properties, certain oil and gas leases and the associated overriding royalty interests, and a $50,000 payment [Dkt. Nos. 80 and 95].

41.     At this time, all disputes with the Boyce Entities have been resolved and settled.

**(iv)     MCS Settlement**

42.     Based on this investigation, the Receiver discovered that, despite massive losses on other ventures, certain entities associated with MC Smith Realty, LLC—MCS Small Cap Fund I, LP, MCS Stewardship No. 2 Invest, LP, and MCS Stewardship No. 3 Invest, LP (collectively, the "**MCS Parties**")—realized "net profits" that total about $3 million from their dealings with the Defendants.  In order to efficiently investigate potential claims against the MCS Parties, and potential defenses to such claims, the Receiver retained Jeff Goldfarb as contingency fee counsel.  *See* Section A.  After extensive discovery by Mr. Goldfarb and the

Receiver, as well as extensive negotiations with counsel for the MCS Parties, the Receiver determined that it was in the best interest of the Estate to enter into a Compromise & Settlement Agreement to resolve the claims against the MCS Parties.   Under the Settlement, the MCS Parties made a payment of $1,335,000 to the Receiver for the benefit of the Estate.[4]

43.     At this time, all disputes with the MCS Parties have been resolved and settled.

**(v)     Bristlewood Claim Settlement**

44.     The Bristlewood Claimants[5] represent several of the most significant investors in the Defendants.   The Bristlewood Claimants have submitted proofs of claim and a full cash accounting to the Receiver demonstrating net losses from their investments with the Defendants in the amount of $9,137,715.75.   *See* Agreed Motion to Approve Claim Determination [Dkt. No. 155].  The Bristlewood Claimants' claims however, are complicated by the fact that one or more of the Defendants acted as the general partner for some of the Bristlewood Claimants and continue to own a 40% profits interest in some of the Bristlewood Claimants.   In order to avoid the cost of litigating the amount of the claim against the Estate, the Bristlewood Claimants and the Receiver entered into a Claim Stipulation and Agreement in which the Bristlewood Claimants agree to accept a claim amount of $7,619,116.21 (a reduction of $1,518,599.54). Additionally, the Receivership Estate will continue to have a 40% profits interest in some of the Bristlewood Claimants.   In the Receiver's judgment, the settlement reflects the highest

---

[4] The Receiver paid professional fees and expenses to the law firm of Goldfarb LLP pursuant to the Court-approved retention agreement in the total amount of $333,750.00 (or 25% of the $1,335,000.00 settlement payment plus $210 in expenses).

[5] The Bristlewood Claimants include Bristlewood, LP, Stewardship Fund No. 2, LP, Stewardship Fund No. 3, LP, Stewardship Fund No. 4, LP, Stewardship Fund No. 5, LP, Stewardship Fund No. 6, LP, Stewardship Fund No. 7, LP, Canadian Peso 21, Klipspringer Partners LP, Kennywood Partners, Ltd., J. Christopher Dance, Leslie T. Merrick Investment Trust, The Kenny Allen Troutt Descendants Trust, Canadian Peso 25, and Canadian Peso 27.

conceivable offset that the Estate could have obtained and maintains an asset of the Estate without the expense of litigation.

**(vi)** **Graves Settlement**

45.     The Graves Parties[6] entered into a series of transactions with the Defendants before the Receivership.  Based on his investigation, the Receiver determined that certain of the Graves Parties were "net winners" in their transactions with the Defendants and, therefore, filed a motion to show cause against the Graves Parties [Dkt. No. 170].  In response to the motion to show cause, the Graves Parties entered into negotiations with the Receiver and demonstrated that each of the net winner entities was insolvent.  In order to settle potential claims between the Graves Parties and the Estate without the expense of litigation, the Receiver entered in a Settlement Agreement with the Graves Parties in which the Graves Parties waived their interest in certain Estate assets that the Receiver was attempting to sell and provided the Estate with mortgages and promissory notes received from the Defendants.  The Receiver then entered into a settlement with American Mutual regarding the mortgages and promissory notes.

46.     At this time, all disputes with the Graves Parties have been resolved and settled.

**(vii)** **American Mutual Settlement**

47.     Prior to the Receivership American Mutual, LP ("**American Mutual**") attempted to purchase 50 mortgages and promissory notes from the Defendants for $508,676.61.  American Mutual, however, did not receive assignments and allonges or the physical documents it purportedly purchased.  As a result, the Receiver claimed that the Estate owned an interest in the assets.

---

[6] The Graves Parties include JEG Property Investments, L.P. f/k/a Beracah Valley Enterprises, LP; NG Roth Investments, LLC; JG Roth Investments, LLC; JG Roth, LLC; HNG ESA, LLC; JDG ESA, LLC; SKG ESA, LLC; REG ESA, LLC; JAG ESA, LLC; John Graves; Nicole Graves; and JEG Property Investments 401k Trust.

48.     After extensive negotiations with American Mutual, the Receiver entered into a settlement and release agreement in which the Estate provided American Mutual 40 of the 50 assets it attempted to purchase in exchange for a payment of $50,000 to the Receivership Estate and a waiver of any and all claims against the Estate.

49.     At this time, all disputes with American Mutual have been resolved and settled.

**(viii)   HSP Entities Settlement**

50.     With the assistance of contingency fee counsel Jeffrey Goldfarb (*See* Section A), the Receiver has also investigated potential causes of action against the HSP Entities[7] ("**HSP**"). HSP paid $1.5 million to certain Defendants to purchase an asset package.  The assets, however, were never delivered to HSP.  Subsequently, HSP was paid $1.8 million from certain other Defendants, purportedly as reimbursement for the $1.5 million prior payment as well as other amounts owing to HSP.

51.     The Receiver prepared for litigation against the HSP Entities, but before filing suit, engaged in extensive settlement negotiations.  Based on those negotiations, the Receiver entered into a Settlement Agreement to resolve claims against the HSP Entities.  Under the Settlement Agreement the HSP Entities made a $550,000 payment to the Estate[8] in exchange for a release of all claims against the HSP Entities.  The Receiver filed a motion to approve the settlement agreement [Dkt. No 281], which received an objection from the Finch & Barry Group

---

[7] The HSP Entities include Home Solutions Capital, LLC, Home Solutions GP, LP, Home Solutions Advisors, LLC, Home Solutions Partners I, LP, Home Solutions Partners I REO, LLC, Home Solutions Partners III, LP, Home Solutions Partners III REO, LLC ("HSP III"), Home Solutions Partners IV, LP, Home Solutions Partners IV REO, LLC ("HSP IV"), Harbour Portfolio Advisors, LLC, Harbour Portfolio Capital, LLC, Harbour Portfolio GP, LP, Harbour Portfolio V, LLC ("Harbour V"), and Harbour Portfolio VI, LP, and affiliates, partners, and employees.

[8] Contingency fee counsel was paid $105,763.18 from the settlement proceeds.

("**F&B**").[9]  Although the Court ultimately approved the settlement with the HSP Entities, the objection by F&B significantly delayed approval of the settlement, as well as the receipt of payment from the HSP Entities.[10]

52.     At this time, all disputes with the HSP Entities have been resolved and settled.

**(ix)**     **Finch & Barry Settlement**

53.     F&B entered into and funded transactions to purchase non-performing mortgages and REO properties from the Defendants in April 2011.  As part of the exchange, F&B transferred more than $3 million to an account in the name of "Home Solutions Partners, LP." According to the Receiver's investigation, public records, and the other HSP Entities, Home Solutions Partners, LP does not exist.  The Receiver's investigation has revealed that F&B did not receive any assets from Defendants and that the money from F&B was comingled with other funds of the Estate and, ultimately, paid to third parties.

54.     On October 24, 2013, F&B objected to the Receiver's settlement with the HSP Entities asserting at least $3,139,667.20 in claims against the Estate and the HSP Entities associated with the transfers of its investment funds.  *See* Response and Objection to Motion to Approve Settlement with the Home Solutions Affiliates [Dkt. No. 289].  In order to resolve F&B's objections to the settlement with the HSP Entities and reduce F&B's claim, the Receiver engaged in settlement negotiations with F&B that ultimately resulted in a Settlement Agreement. Under the Settlement Agreement, the Receiver will pay $100,000 from settlement with the HSP Entities to F&B in exchange for F&B withdrawing its objections to the settlement with the HSP

---

[9] The Finch & Barry Group includes affiliated investment entities F & B Note Holding, LLC, MVB Realty Holdings, LLC, LF Realty Holdings, LLC, 48th Street Holdings, LLC, MDA Realty Holdings, LLC, and their affiliates.

[10] The payment of the $550,000 was contingent on Court-approval of the settlement agreement.  The Receiver has received the $550,000 from the HSP Entities.

Entities and reducing its claim against the Estate to $2 million or less (a reduction of over $1 million).  In short, F&B will receive $100,000 from the HSP Entities and will waive over $1 million in claims against the Estate.

55.     The Receiver filed a motion to approve the F&B settlement with the Court [Dkt. No. 333], which was approved [Dkt. No. 339].  The Receiver has received the $550,000 payment from the HSP Entities and has disbursed the $100,000 payment to F&B.

56.     At this time, all disputes with F&B have been resolved and settled.

**(x)     Halo Settlement**

57.     The Receiver has also alleged claims against Halo Companies, Inc. ("**Halo**") and sought to resolve those potential claims through settlement with Halo.  The Defendants and Halo had a close business relationship prior to the Receivership and, at one point, had entered into negotiations to merge their companies.  Because of this close business relationship, Halo and the Defendants entered into several formal and informal business transaction, many of which were inadequately documented or not documented at all.  As a result of the poor documentation of transactions, the Receiver has determined that any claims against Halo would need to be proven with testimony from James Temme, who has asserted his Fifth Amendment rights in this matter and refused to provide testimony.  Based on the lack of competent evidence, and other considerations detailed in the Reply in Support of Motion to Approve Settlement Agreement with Halo Companies, Inc. [Dkt. No. 268], the Receiver entered into a Settlement Agreement with Halo in which Halo will pay the Estate $250,000[11] and waive all claims against the Estate [Dkt. No. 244].

---

[11] The $250,000 settlement payment will be made in twelve (12) equal monthly installments.

58.     The proposed settlement with Halo was objected to by two investors groups, the Association and the Berg Group.[12]  Magistrate Judge Amos L. Mazzant entered a Report and Recommendation approving the settlement agreement with Halo [Dkt. No 290], which was adopted by District Judge Ron Clark [Dkt. No. 341].  The Berg Group filed a Motion to Reconsider, which was also denied by District Judge Ron Clark [Dkt. No. 352].

59.     Despite the denial of the Motion to Reconsider, the Berg Group continued to assert that it would appeal the order approving the settlement with Halo, even potentially after the conclusion of the case.  As a result, Halo took the position that the settlement agreement was not final and would not begin making settlement payments until the Court entered a Rule 54(b) final judgment regarding the settlement agreement.  On February 25, 2015, the Receiver file a Motion for Entry of Judgment under Rule 54(b) [Dkt. No. 367] requesting that all orders approving settlement agreements, including the Halo settlement, be given the effect of a final judgment.  No objections to the Rule 54(b) motion were filed and, therefore, the order became final.

60.     Halo has made several settlement payments.  Once the final settlement payment is received, the Estate will have resolved and settled all disputes with Halo.

**(xi)    Motion for Relief from Stay/Motion to Compel Discovery**

61.     In addition to alleging potential lawsuits and negotiating settlements on behalf of the Estate, the Receiver has been required to attend to other litigation against the Estate.  For example, the Receiver successfully defended against a request for relief from stay which would have allowed certain investors to pursue claims against the Defendants [Dkt. No. 96].  If the motion for relief from stay was successful, the Receiver would have been required to

---

[12] The Berg Group includes Bruce Berg, Stuart Cartner, Kevin Doyle, Walter Haydock, Edward Leh, Kevin Murphy, Philip Schantz, DAIS Partners, LP, Singer Bros., LLC, Skeleton Lake, LLC, and Wildcat Lake Partners.

simultaneously defend those causes of action (in order to preserve the Estate) while pursuing assets of the Estate.

62.     Likewise, the Receiver successfully defended against a motion to compel discovery from certain investors which would have required the Receiver to spend tens of hours responding to discovery requests and reviewing documents for the benefit of certain investors [Dkt. No. 100].

**(xii)     <u>Litigation against Escrow Companies</u>**

63.     The Receiver, with the assistance of outside counsel Andrew Whitaker (*see* Sec. A), has investigated potential lawsuits against two escrow companies that conducted substantial business with the Defendants, American Equity Funding, LP ("**AEF**") and Madison Settlement Services, LLC ("**Madison**").   Both AEF and Madison conducted substantial business with the Defendants, including performing escrow services, serving as a broker on sales and acquisitions of assets, and distributing funds to the Defendants and investors.   AEF and Madison knew or should have known that the Defendants' conduct was fraudulent and reaped substantial profits from their business with the Defendants.

64.      The Receiver has entered into settlement agreements with both AEF and Madison [Dkt. Nos. 356, 359], which were approved by the Court [Dkt. Nos. 364, 365].   Under the settlement agreements, AEF will pay the Estate $100,000 in two payments of $50,000 and Madison will pay $75,000, in four installments.[13]

---

[13] All payments from Madison have been received.  The first payment of $50,000 from AEF has been received and the Receiver anticipates receiving the final payment of $50,000 in July 2016.

**D.**   <u>**Interim Distribution**</u>

65.     On December 30, 2014, the Receiver filed his Motion for Approval of Interim Distribution Plan and Entry of Claims Bar Date (the "**Interim Distribution Motion**")  [Dkt. No. 361], which was approved by the Court on February 2, 2015 [Dkt. No. 366].   The Interim Distribution Plan provides the date by which investors in the Defendants must file a proof of claim in order to participate in a distribution from the Receivership Estate (the "**Bar Date**").   The Bar Date was March 5, 2015 and notice of the Bar Date was posted on the Receivership website (www.stewardshipfundreceivership.com) on February 3, 2015.

66.     Pursuant to the Receiver's Interim Distribution Motion and the Order granting the Interim Distribution Motion [Dkt. No. 366], the Receiver was permitted to make an interim distribution to all Claimants with an Allowed Claim (all capitalized terms not defined herein are defined in accordance with the Interim Distribution Motion).

67.     The Receiver received and reviewed 174 Claims, as follows:

| | |
|---|---|
| Total Amount Invested by Claimants | $52,321,240.96 |
| Distributions made prior to Receivership | $ 9,898,697.40 |
| Total Claims as Submitted by Claimants | $42,514,092.06 |
| Total Amount Objected to by Receiver | $  317,206.30 |
| Total Agreed Reductions on Claims | $ 9,370,595.32 |
| **Proposed Net Allowed Claim Amount** | **$32,717,398.15** |

68.     In July 2015, the interim distribution was made to investors on a pro rata basis based on the Proposed Net Allowed Claim Amount and the Available Funds.[14]   The interim distribution was made from the Available Funds of the Receiver, which was determined as follows:

| | |
|---|---|
| Available Funds | $ 1,439,000 |
| Less outstanding administrative costs | $    325,000 |
| Less expected administrative costs | $      50,000 |
| Money available for distribution | $ 1,064,000 |
| Percentage of available funds to be distributed | 90% |
| **Interim Distribution (rounded)** | **$  950,000** |

69.     The Receiver anticipates making a final distribution in late 2016.

**E.      Trial Preparation**

70.     Trial in this matter was scheduled to begin on March 31, 2014.  The SEC and counsel for Defendants anticipated a one week trial with the Receiver providing testimony for several days.  Based on his anticipated extensive testimony, the Receiver and his counsel spent substantial time preparing for trial, including more fully investigating certain investor claims, reviewing physical and electronic evidence, and interviewing investors and other parties.   On February 25, 2014, the Court indefinitely continued the trial setting so that the Defendants and the SEC can continue settlement negotiations [Dkt. No. 332].   The Receiver has, therefore, suspended his trial preparation work, which will reconvene in the event a trial date is set.

---

[14] On March 22, 2016, the Receiver filed a Motion to Re-Issue Claims Distribution checks to replace two (2) investor claim checks, which was granted on April 18, 2016.  The Receiver acquired from the Estate accountant the **unsigned** replacement claim checks.  Before the checks could be executed and provided to the claimants, they were stolen from the Receiver's locked office and cashed.  The Receiver reported the stolen claim checks to the Dallas Police Department and Chase Bank.  Chase Bank has agreed to refund the stolen checks.

**F.**     **Evidence Preservation**

71.     Upon his appointment, the Receiver took control of the premises, property and documents at the Defendants' corporate offices at 2500 Dallas Parkway, Suite 230 Plano, TX 75093 (the "**Premises**").   The Receiver and his team immediately took possession of the Premises and changed the locks with the aid of the landlord.

72.     The Receiver removed all relevant paper documents from the Premises and secured pertinent hard drives, computers, and servers to the offices of Bryan Cave LLP or its vendors.   The Receiver has and will make the Defendants' records and information and its computer system available to the Commission.

**G.**     **Investor Relations**

73.     The Receiver and his team have fielded daily telephone calls and e-mails from investors, homeowners, and creditors of Defendants and have personally spoken with dozens of investors, homeowners, and creditors.

74.     The Receiver established a website at //www.stewardshipfundreceivership.com in order to provide information to and obtain information from investors of the Defendants.

75.     In addition to the foregoing, the Receiver and his counsel are engaged in other investigation and recovery efforts on which it would be premature to report or where public disclosure of the efforts would potentially adversely impact the prospects of success.

76.     The Receiver has corresponded with hundreds of taxing and regulatory authorities that have provided notice of various efforts to impact the underlying collateral and in some instances property owned by the receivership estates.   The result of this correspondence in many cases has been to eliminate enforcement efforts.   It is anticipated that this will result in value to the receivership estate.

**H.**   <u>**Administration of the Estate**</u>

77.    Because the Receiver has, by-and-large, administered the claims process and liquidated the assets of the Estate, the Receiver anticipates that the costs of administration will significantly diminish until the case is closed and, as indicated above, anticipates that administrative costs will be less than $50,000 to close the case.

**L.**   <u>**Operations of Defendants**</u>

78.    The Defendants are no longer operating.

79.    All information stated above is based on the knowledge of the Receiver at this point in time and later developments and discoveries may cause the information reported herein to be outdated or incorrect.

Dated: June 20, 2016                        Respectfully Submitted:


　　　　　　　　　　　　　　　　　　　　   *//s// Keith Miles Aurzada*
　　　　　　　　　　　　　　　　　　　　   Keith Miles Aurzada, Receiver

　　　　　　　　　　　　　　　　　　　　   2200 Ross Avenue, Suite 3300
　　　　　　　　　　　　　　　　　　　　   Dallas, Texas  75201
　　　　　　　　　　　　　　　　　　　　   Telephone:  214.721.8041
　　　　　　　　　　　　　　　　　　　　   Facsimile:  214.721.8100

## CERTIFICATE OF SERVICE

I certify that on June 20, 2016, a true and correct copy of the foregoing pleading was served *via* the Court's CM/ECF system to all parties consenting to service through the same, including to the following:

David Reece
United States Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102

John Helms, Jr.
Fitzpatrick Hagood Smith & Uhl LLP
Chateau Plaza, Suite 1400
2515 McKinney Avenue
Dallas, TX 75201
COUNSEL FOR JAMES G. TEMME

Moreover, the foregoing will be uploaded to www.stewardshipfundreceivership.com

_____//s// Keith Miles Aurzada_____
Keith Miles Aurzada, Receiver